## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

DEANERIC DUPAS,

                    Plaintiff,

     v.

WARDEN WILLIAM MULLIGAN, *ET AL.*,

                    Defendants.

3:19 - CV- 1600 (CSH)

**MARCH 30, 2022**

## RULING ON PLAINTIFF'S MOTION TO AMEND
## HIS AMENDED COMPLAINT [Doc. 11] AND INITIAL REVIEW ORDER

### I.  INTRODUCTION

Plaintiff Dean Eric Dupas, a convicted inmate currently confined at the MacDougall-Walker Correctional Institution  ("MacDougall-Walker"), previously filed an amended civil rights complaint *pro se* under 42 U.S.C. § 1983.  He has now filed a motion to amend that complaint a second time. The Court herein will rule on his motion to amend, and in assessing his claims for futility, will also issue its "Initial Review Order" pursuant to 28 U.S.C. § 1915A(b).

### II. DISCUSSION

#### A.   Standard to Amend Complaint

Pursuant to Federal Rule of Civil Procedure 15, a plaintiff may amend his complaint once as a matter of course within twenty-one days after service of the complaint or within twenty-one days after service of a responsive pleading (*i.e.,* answer or motion to dismiss), whichever is earlier.  *See* Fed. R. Civ. P. 15(a)(1)(A) and (B).  In all other cases, the plaintiff may amend his complaint only "with the opposing party's  written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).  In the present case, Dupas has previously filed an "Amended Complaint" [Doc. 8] so he may not amend

1

his complaint again as a matter of right.  No defendant has yet been served so there can be no

"written consent" of an opposing party.  Therefore, Plaintiff may only amend "with the court's

leave," which shall be "freely give[n] . . . when justice so requires." *Id*.

Whether to grant leave to amend ultimately lies within the court's discretion, taking into

account factors set forth by the United States Supreme Court in *Foman v. Davis*, 371 U.S. 178, 182

(1962).  Under *Foman*,  "[i]n the absence of any apparent or declared reason—such as undue delay,

bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the

amendment, futility of the amendment, etc.—the leave sought [to amend] should, as the rules

require, be 'freely given.'" 371 U.S. at 182.

In addition, with respect to *pro se* litigants, it is well-established that "[p]ro se submissions

are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the

strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24,

26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)

(per curiam)).  A proposed amended complaint by a *pro se* litigant will thus be construed liberally,

assuming the truth of the allegations and interpreting them to raise the strongest arguments they may

suggest.  *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007).

In the case at bar, Dupas asserts that he seeks to amend his complaint to allege "exhaustion

of remedies," including facts he previously "left out" of his complaint, and to remove various

defendants from the action (*i.e.*, "William Mulligan, Gerald Hines, Jeanotte and Katz").[1]  Doc. 11,

---

[1]  Plaintiff also deleted  Correctional Nurse Supervisor Tawanna Furtick as a defendant in
this action.

2

at 1-2 (¶¶ 1- 2).  These are substantive changes which Plaintiff believes improve his pleading.

Plaintiff  has  created no "undue delay," and has exhibited no "bad faith, dilatory motive . . . or repeated failure to cure deficiencies." *Foman*, 371 U.S. 182. There is also no "undue prejudice" to defendants who have not yet been served.  *Id.*   Under these circumstances, the Court will grant Plaintiff's  motion to amend his complaint, subject to dismissal of any "futile" claims that the Court discovers during its contemporaneous analysis to issue the "Initial Review Order." *See* Part II.B.-D., *infra*.  Also, in light of Plaintiff's  *pro se* status, in  exercising this review for "futility," the Court will construe the claims liberally to raise the strongest arguments they suggest.

Pursuant to 28 U.S.C. § 1915A(b)(1)-(2), it is this Court's duty to review a  prisoner's civil complaint against governmental actors and "dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b)(1)-(2). Such a claim would be "futile" for purposes of amendment.

In his proposed Second Amended Complaint, under 42 U.S.C .§ 1983, Plaintiff Dupas, alleges civil rights violations against Dr. Frankie Cuevas, the dentist at MacDougall-Walker, and Kirsten Shea, Regional Chief Operating Officer ("RCOO")  for the Connecticut Department of Correction ("DOC") at all relevant times.  Doc. 11-1, at 2 (¶¶ 4-5). [2]  Both Cuevas and Shea are sued

---

Furthermore, to support amendment of his complaint, Plaintiff alleges that he came "into information that [he] did not have when doing the complaint or amended complaint." Doc. 11, at 2. He thus asserts that the second Amended Complaint is more factually complete.

[2] RCOOs were also formerly known as Health Services Administrators within the Department of Correction.  *See* Connecticut Department of Correction P.R.I.D.E. at Work Newsletter, Aug. 1, 2018, through Sept. 28, 2018, at 8.  This newsletter may be found at: http://portal.ct.gov/-/media/DOC/Pdf/Pride/ Pride20180928.pdf?la=en.

in their individual capacities for deliberate indifference to Plaintiff's serious dental needs in violation of the Eighth Amendment. *Id.* at 3 (¶ 6). With respect to this constitutional claim, Plaintiff seeks punitive damages of $1,000 against each defendant and his "cost[s] in this suit." *Id.* at 17 (¶¶ B.1. & D.).

Plaintiff also alleges a Connecticut tort claim of malpractice against both defendants for "failure . . . to provide adequate dental care that meets the community standards." *Id.* at 15 (¶ 41). In his claim for relief, Plaintiff seeks compensatory damages:  (1) $2,055 from Cuevas for pain and suffering due to "failure to prescribe filling work" or to make a "refer[ral] to another dentist;" $4,745 against Cuevas for pain and suffering due to delay in providing Plaintiff with dentures for 949 days; and $850 against Shea for pain and suffering resulting from her delay in sending Plaintiff for dental care. *Id.* at 15-16 ("Relief Requested") (¶¶ VI. A. 1.-3.). Moreover, Plaintiff seeks punitive damages in the amount of $1,000 from each defendant. *Id.* at 17 (¶ B.1.).

The Court now reviews Dupas's proposed second Amended Complaint to determine whether his claims may proceed under 28 U.S.C. § 1915A.  For the following reasons, Plaintiff will be granted leave to amend, but his second Amended Complaint will be  DISMISSED in part.

**B.  Standard of Review for Initial Review Order**

Pursuant to 28 U.S.C. § 1915A(b), the Court must review prisoner civil complaints against governmental actors and "dismiss ... any portion of [a] complaint [that] . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b)(1)-(2).  Although detailed allegations are not required, a complaint  "must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This plausibility standard is not simply a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.*

In undertaking this analysis, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  However, the Court is "not . . . bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678.  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

With respect to *pro se* litigants, it is well-established that "[p]ro se submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam)).  *See also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'") (internal citations omitted).  This liberal approach, however, does not exempt *pro se* litigants from the minimum pleading

5

requirements described above. A *pro se* plaintiff's complaint still must "state a claim to relief that is plausible on its face." *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). Therefore, even in a *pro se* case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted). Moreover, the Court may not "invent factual allegations" that the plaintiff has not pleaded. *Id.*

## C. Factual Allegations

At the outset, the Court takes judicial notice that Dr. Cuevas is a licensed dentist in the State of Connecticut who provided dental care to inmates, like Plaintiff, at MacDougall-Walker prison on the dates relevant to this action. On January 31, 2018, while incarcerated at MacDougall-Walker, Dupas sent a written request to the dental unit requesting to be "call[ed] . . . down to finish the [dental] work Garner [Correctional Institution] [had] started."[3] Doc. 11-1, at 19 (Ex. 1, "Inmate Request Form"). On February 2, 2018, Dupas received a response, stating that "barring any unforeseen circumstances" he was scheduled for an appointment on April 3, 2018; and "[i]f not, [he would] be rescheduled for the next available appointment." *Id.* On March 16, 2018, Plaintiff sent another request to the dental unit, this time asking for an appointment to fix a cap that was "breaking off." *Id*. at 3 (¶ 8). Dental staff once again informed Plaintiff that he would be seen by the dentist on April 3, 2018, or at the "next available appointment." *Id.* at 20 (Ex. 2).

### *1. Extraction of Tooth No. 24 and Cavities*

On April 3, 2018, Dupas attended an appointment at MacDougall-Walker with Dr. Cuevas.

---

[3] While previously housed at Garner Correctional Institution, Plaintiff received dental treatments from a dentist other than Cuevas.

*Id.* at 3 (¶ 9).  After taking x-rays of Dupas's teeth, Dr. Cuevas identified three teeth that had cavities which needed to be filled  (tooth numbers  ("nos.") 3,  19, and  29), and one tooth with the cap broken that could not be restored so needed to be extracted (tooth no. 24).[4]  *Id.* at 21 (Ex. 3).  Dupas signed an "Oral Surgery Consent and Identification"  form, consenting to having tooth no. 24 extracted and to the administration of appropriate local anesthesia during the extraction.  *Id.* at 22 (Ex. 4, "Oral Surgery Consent and Identification Form").

Dr. Cuevas extracted tooth no. 24 with local anesthesia and prescribed Motrin and Tylenol for pain. *Id.* at 21 (Ex. 3, notes on Dental Record of Dupas).  Dr. Cuevas did not, however, fill tooth nos. 3,  19 and/or  29 because Plaintiff refused the injection  of novocaine for such fillings.  *Id.* at 3-4  (¶ 9).  Plaintiff asserts that Cuevas interfered with his prescribed treatment by refusing to either perform the  filling  work  or refer him to  Garner  Correctional  Institution  ("Garner"),  Cheshire Correctional Institution ("Cheshire"), or UCONN Health Center ("UCONN").  *Id.* at 4 (¶ 10).

On April 18, 2018, Dupas sent a request to the MacDougall-Walker dental department with a complaint of a "really bad" toothache.  *Id.* at 4 (¶ 11) and  24 (Ex. 5, "Inmate Request Form"). On April 20, 2018, Cuevas examined Dupas, prescribed Motrin for pain, and noted that tooth nos. 3, 19, and  29 still needed to be filled.  *Id.* at 4 (¶ 12) and  25  (Ex. 5).  Dupas claims that Dr. Cuevas again refused to fill the three teeth because Dupas refused to consent to being injected with an anesthetic.  *Id.* at 4 (¶ 12). Also, Cuevas informed Dupas that if he "continue[d] to refuse treatment, it was likely that the infected teeth would have to be extracted."  *Id.*

---

[4]  According to Dupas, Cuevas examined the tooth with the broken cap and "said all he could do was remove it."  Doc. 11-1, at 3-4 (¶ 9).

On June 18, 2018, Dupas sent another request to the dental unit, stating that he had one loose tooth and another one that caused him pain when he brushed it. *Id.* at 5 (¶ 13) and 26 (Ex. 7, "Inmate Request Form"). On July 10, 2018, Dr. Cuevas examined Dupas regarding his alleged sensitivity in a tooth (no. 23). *Id.* at 5 (¶ 14). An x-ray of the tooth showed some root exposure but that the tooth was still vital. *Id.* at 30 (Ex. 8). Cuevas noted that although the tooth was sensitive to cold, that sensitivity did not linger. *Id.* Also, Cuevas again recommended that tooth nos. 3, 19, and 29 be filled. *Id.* at 29-30. Because Dupas refused to consent to the restoration of these teeth under a local anesthetic, Cuevas did not perform the restoration work. *Id.* at 30. Cuevas thus informed Dupas that he "ha[d] conditions that require[d] immediate treatment" or would "likely . . . become emergent under 12 months." *Id.* at 30 (Ex. 8) and 33 (Ex. 10). In other words, it was likely Dupas would lose the three infected teeth if the recommended restoration work was not performed soon. *Id.* at 5 (¶ 15).

Later that day, Dupas filed a Health Services Review request to complain that Dr. Cuevas would not perform the restoration of tooth no. 23, the one with root sensitivity, because Dupas had refused consent to the injection of an anesthetic *Id.* at 32 (Ex. 9, "Inmate Administrative Remedy Form"). *See also id.* at 30 (Ex. 8). Dupas requested that Dr. Cuevas be instructed to perform the restoration without "numbing" him or that he be transferred to another correctional institution—Garner or Cheshire—or the University of Connecticut Health Center, where he believed a dentist would perform the restoration without an anesthetic. *Id.* Dupas also offered to "resolve the issue" by "request[ing] $50 a day for pain." *Id.* at 32 (Ex. 9) and 5 (¶ 15).

On August 3, 2018, Dupas was seen by Cuevas to see if there was any "mobility on anterior teeth near [the former] extraction site" of tooth no. 24. *Id.* at 33 (Ex. 10, Dental Records). Cuevas concluded that these teeth were "within normal limits." *Id.*

On November 26, 2018, Dupas sent Director of Medical Services Rick Furey a "request," stating that Dr. Cuevas had seen him on July 10, 2018, regarding root sensitivity but had refused to perform the needed filling work without anesthesia, despite the fact that Dupas had previously undergone this kind of work before "without being numb" or feeling pain during drilling or after. *Id.* at 12 (¶ 32). Dupas thus believes that his right to refuse medication was being violated by Cuevas's refusal to perform treatment. *Id.* Consequently, Plaintiff requested to be sent to Garner, Cheshire, or UCONN to have the needed work performed without pain medication. *Id*. and at 108 (Ex. 29).

On December 5, 2018, Plaintiff received a response to his November 26 dental complaint from Kirsten Shea, Regional Chief Operating Officer (" RCOO"), explaining that upon review of that request, she was sending it to Dr. Katz, the Statewide Dental Director. *Id.* at 110 (Ex. 30). After consulting with Dr. Katz, on December 20, 2018, Shea wrote to Dupas, stating that Katz "agreed that the work to be performed should not be done without the appropriate level of anesthetic." *Id.* at 111 (Ex. 31).

Dupas next sent a request for a dental visit on January 5, 2019. *Id.* at 6 (¶ 17). He once again requested to have the prescribed filling work done without novocaine because he was "in pain when [he] drank anything cold." *Id.* and 35 (Ex. 11). Dupas threatened that if the filling work was not completed, he would file a claim with the prison's "insurance provider," as well as "a [§] 1983 [claim] for deliberate indifference to dental care." *Id.* at 35 (Ex. 11). On February 8, 2019, Cuevas

responded with the statement: "You have refused the recommended treatment.  Let me know when you are ready to follow through with [the] recommended treatment." *Id.*

During January and February, 2019, Plaintiff filed a series of grievances with the DOC.  On January 14, 2019, Dupas sent an Inmate Request to Deputy Warden Hines claiming that Dr. Cuevas was violating his right to undergo dental work without an anesthetic.  *Id.* at 39  (Ex. 13).  On January 17, 2019, Deputy Warden Jeannotte responded to the request sent to Deputy Warden Hines and indicated that if Dupas sought to have the restoration work performed, he must consent to the conditions under which Dr. Cuevas had agreed to perform the work.  *Id.* On January 21, 2019, Plaintiff then filed a grievance regarding Jeannotte's response to his request to Deputy Warden Hines. *Id*. at 6-7 (¶ 18) and  38 (Ex. 12). On February 19, 2019, Shea "denied" the January 21, 2019, grievance, noting "You have refused recommended treatment.  If you wish to follow through with the recommended treatment you can write a request."  *Id.* at 38 (Ex. 12).

On January 30, 2019, Dupas filed a request that Cuevas be required to respond to his earlier request of January 8, 2019, requesting fillings without anesthesia.  *Id.* at 7 (¶ 19) and  43 (Ex. 14).  On February 19, 2019, Shea responded to Dupas's request of January 30, 2019, stating that the "disposition" of the request was "compromise" as of that date; the request was "returned and scanned."  *Id.* at 43 (Ex. 14).  On February 4, 2019, Plaintiff had filed a grievance regarding his January 14, 2019,  request to Deputy Warden Hines due to Hines's failure to respond to his request to "look into why Frankie Cuevas keeps violating [his] right to refuse anesthesia, but still have the dental work prescribed done."  *Id.* at 7 (¶ 20) , 39 (Ex. 13), and  40 -41 (Ex. 15).  On February 19, 2019, the grievance regarding Hines's failure to respond had been  "denied" as "completed" by Shea. *Id.* at 41 (Ex. 15).

10

On March 3, 2019, Plaintiff filed another grievance, this time in reference to his January 5, 2019, request for dental care "without anesthetic" as is his "right;" he also noted that he remained "in pain" whenever he drank anything cold. *Id.* at 7 (¶ 22) and 45 (Ex. 16). On April 1, 2019, Shea denied his grievance as a "duplicate" grievance and " as more than 30 days of [the] occurrence cited," January 5, 2019. *Id.* at 45 (Ex. 16).

On March 4, 2019, Dupas sent an "Inmate Request" to Warden Mulligan asking him to investigate why Dr. Cuevas and Deputy Warden Jeannotte had violated his right to refuse to consent to an anesthetic before undergoing dental treatment and why Nurse Furtick refused to respond to his "Inmate Request" regarding dental treatment. *Id.* at 112 (Ex. 32). In that same request, Dupas proposed to resolve the situation by having "all fees from April 3, 2018, . . . refunded into [his] inmate account" and Cuevas to perform the dental work without anesthetic or send him to Cheshire or Garner prison or UCONN (because the dentists at any one of these locations will perform the work without anesthetic). *Id.* at 13-14 (¶ 35) and 113 (Ex. 32).

On March 20, 2019, RCOO Shea responded to the request sent to Warden Mulligan. *Id.* at 114 (Ex. 32). She indicated that Dr. Cuevas "finds it in the best interest of you, the patient, as well as within his clinical judgement that performing this procedure without anesthetic would be dangerous and cause possible harm." *Id.* Shea further provided that Nurse Furtick "had not intentionally refused to respond to [Dupas's] request;" and Deputy Warden Jeannotte had informed him of the treatment plan that had been recommended by Dr. Cuevas and Dr. Katz, the acting Dental Director of DOC. *Id.* Moreover, "[t]here have been two clinical opinions concerning your case and both doctors [Cuevas and Katz, DOC Dental Director] agree on the outcome." *Id.*

On April 3, 2019, Plaintiff filed a grievance appeal, stating that a "staff member cannot hold a request for over 30 days." *Id.* at 8 (¶ 23).  Moreover, pursuant to Administrative Directive 9.6 , "no employee who is a subject of an investigation shall investigate or participate in the resolution of any remedy;" and Cuevas had participated in both the investigation and resolution of Plaintiff's complaints about him. *Id.* at 8-9 (¶ 23).

Following multiple complaints by Dupas's mother to Shea regarding her son's dental needs, in April of 2019, Shea contacted the dentist at Cheshire and arranged for Plaintiff to have his fillings done there. *Id.* at 14 (¶ 36).   On May 16, 2019, prison officials at MacDougall-Walker sent Dupas to Cheshire to undergo the restoration dental work without an anesthetic.  *Id.* at 14 (¶ 36) and 119-21 (Ex. 33).   On Plaintiff's  dental records for May 16, 2019, the dentist at Cheshire, Bruce Lichtenstein, noted that the patient had been  "transferred from MacDougall CI at [the] request of RCOO to complete patient's dental work since he would rather not have anesthesia for his routine opr  work.  This [had previously been] accomplished successfully by myself with this patient while I worked at Garner CI." *Id.* at 120-21 (Ex. 33).   At this "new exam," there was "[n]o anesthesia at patient's request." *Id.*   Lichtenstein restored tooth nos. 3, 4, 19, 27, 28, 29, and 30 without using an anesthetic,  pursuant  to  Dupas's  request.     *Id.* at 120 (indicating on 5/16/2019 numerous "Restoration[s]" - "Amalgam[s] completed" on tooth nos. 3, 4, 19, 29 & 30; and "Resin Composite[s] completed" on tooth nos. 27 & 28).

### 2. Dental Impression for Flipper

On May 16, 2019, Plaintiff requested to have a dental impression done to replace the tooth that had been removed the prior year (tooth no. 24). *Id.* at 9 (¶ 24) and  48 (Ex. 18).   On May 20,

he received a response from dental staff that his name had been added to a list of those needing prosthetics and he would be called when his turn came. *Id.* at 48 (Ex. 18).

On December 16, 2019, Plaintiff sent Cuevas a request to be "called down" to dental to have "an impression done to replace the tooth that was removed by [him] on April 3, 2018." *Id.* at 49 (Ex. 19). Plaintiff requested that such an appointment be scheduled in the "next fifteen business days." *Id.* However, on January 3, 2020, Cuevas responded that Plaintiff was "on the list for treatment;" and "[o]nce all other treatment is completed we may ask permission to start dentures." *Id.*

Plaintiff was not scheduled for a dental impression by January 9, 2020, so he filed a grievance to complain that it had been "over a year since Cuevas extracted the tooth" he wanted replaced and, due to its location, it was "hard for [him] to eat certain fruit," like "apples." *Id.* at 10 (¶ 26) and 51 (Ex. 20). To resolve the issue, he requested "an impression to be taken in the next 30 business days, other treatment to be done, [an order] for dentures be submitted," and "$5.00 per day from April 4, 2018, [till the] date dentures are given to [him]" in light of the pain Cuevas caused him to suffer while waiting for an impression and dentures. *Id.* at 52 (Ex. 20).

Plaintiff alleges that on February 10, 2020, he finally saw Cuevas. *Id*. at 10-11 (¶ 27). The medical records (Ex. 21) indicate that he had an "oral evaluation" and the "problem focused [was] completed." *Id.* at 57 (Ex. 21). In addition, Dupas had an x-ray ("single radiographic image") completed on tooth no. 19. *Id.*

On August 17, 2020, Plaintiff again requested dental treatment, this time for a "toothache" and a worsening cavity. *Id.* at 60 (Ex. 22). On August 24, 2020, Plaintiff received treatment from Cuevas regarding Plaintiff's August 17 request, including an oral evaluation and x-rays on tooth nos.

13

27 and 28.  *Id.* at 66 (Ex. 23).  Thereafter, Plaintiff attended  a series of visits with Cuevas – on

September 25, 2020, October 23, 2020, and November 13, 2020 – regarding a "flipper."[5]  *Id.* at 11

(¶ 30) and 68-95  (Ex. 24-27) (noting x-rays on 9/25/2020, "Denture" treatments on 10/05/2020 and

10/23/2020, and a "Denture- Partial - Acrylic installation" on tooth no. 24 on 11/13/2020).

Based on the foregoing alleged facts, Plaintiff does not believe that the dental care he

received from Cuevas was "consistent with generally accepted practice parameters in the State of

Connecticut as recognized by healthcare providers in the same or similar general specialty."*Id.* at 11-

12 (¶ 31).  Specifically, he claims that such treatment violated the "Community Standard in

[Connecticut's Department of Correction]  Administrative Directive 8.1," which he has appended

as Ex. 28.

Moreover, Plaintiff asserts that Dr. Cuevas and RCOO Shea committed the tort of

malpractice under Connecticut law by failing "to provide adequate dental care" pursuant to the

"Community Standards" set forth in DOC Administrative Directive 8.1 (Ex. 28).  Administrative

Directive 8.1 provides at paragraph 4 that the "contracted health services provider and DOC shall

provide all inmates access to healthcare services that meet community standards."  Doc.  11-1 at 98

(¶ 4).  "Community Standard" is defined in this context as "[t]he scope and quality of . . . dental .

. . services (including but not limited to diagnostic testing, preventive services and suitable after care,

in terms of type, amount, frequency, level, setting and duration appropriate to the patient's diagnosis

or condition) that is  consistent  with  generally  accepted  practice  parameters  in  the  State  of

_____

[5]  The Court takes judicial notice that a "flipper" is "a removable retainer that fits along the roof of your mouth (palate) or sits on your lower jaw, and has one or more prosthetic teeth attached to it."  For description of flipper tooth (temporary partial denture), *see* https://www.healthline.com/ health/what-you-need-to-know-about-maintaining-a-partial-denture-also-known-as-a-flipper-tooth#:~:text=A%20flipper%20tooth%20is%20a,injury%2C%20removal%2C%20or%20decay.

Connecticut as recognized by healthcare providers in the same or similar general specialty . . . ." *Id.* at 97 (¶ 3.A.).

**D. Analysis**

In his currently proposed Amended Complaint, Plaintiff brings actions against "Frankie Cuevas and Kirsten Shea, . . . in their individual capacities. Doc. 11-1,  at 1 (case caption). Moreover, he alleges two claims against each of these defendants: a claim arising under 42 U.S.C. § 1983 for "deliberate indifference to adequate medical care in violation of the 8th Amendment" and a Connecticut claim for malpractice.  *Id.* at 1.

As discussed in Part II.B., pursuant to 28 U.S.C. § 1915A, the Court will review Dupas's civil complaint to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." Because Plaintiff is proceeding *pro se*, the allegations of the complaint will  be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

### *1.  Two Prongs of Eighth Amendment Claims*

The Eighth Amendment prohibits "deliberate indifference to an inmate's serious medical needs" as well as an inmate's serious dental needs.  *Estelle v Gamble*, 429 U.S. 97, 104 (1976); *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) (applying deliberate indifference standard in *Estelle* to claim of untreated tooth cavity).  An inmate must meet  two elements to state a claim that a prison official or medical provider was deliberately indifferent to his medical or dental needs. The objective element requires the inmate to assert facts to demonstrate that his medical or dental

need is serious.  *Hill v. Curcione*, 657 F.3d 116, 122–23 (2d Cir. 2011) (a serious medical need contemplates "a condition of urgency" such as "one that may produce death, degeneration, or extreme pain") (citation and internal quotation marks omitted).  In determining whether a condition is serious, the Court considers whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citations and internal quotation marks omitted).

"[D]ental conditions, like other medical conditions, may be of varying severity," *Chance*, 143 F.3d at 702, and not all dental problems will be sufficiently serious to meet this objective standard. As with other medical conditions, the factors relevant to the seriousness of a dental condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain."  *Id.*  If a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," rather than a denial of any treatment for his or her condition, "it is appropriate to focus on the *challenged delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim."  *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (emphasis in original) (quoting *Chance*, 143 F.3d at 702).

Malpractice of medicine in prison does not amount to an Eighth Amendment violation.  *See Estelle*, 429 U.S. at 107; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). "This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a

mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady." *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir. 2000) (citing *Estelle*, 429 U.S. at 105-06) (holding that "inadvertent failure to provide adequate medical care" or "negligen[ce] in diagnosing or treating a medical condition" does not constitute deliberate indifference on the part of prison officials).

Moreover, it is well established, "that mere disagreement over the proper treatment does not create a constitutional claim.  [As] long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703 (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir.1986)).   Therefore, "disagreements between a prisoner and prison officials over treatment decisions fall short of cruel and unusual punishment." *Sonds v. St. Barnabas Hospital Correctional Health Services*, 151 F. Supp.2d 303, 312 (S.D.N.Y. 2001).   For example, "disagreements over medications, diagnostic techniques (*e.g.*, the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim." *Id.*  Instead, these issues "implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." *Id.* (citation omitted.)

The second element of a § 1983 deliberate indifference claim is subjective.  To meet this element, the inmate must allege that the prison official or medical provider was actually aware that his actions or inactions would cause a substantial risk of serious harm. *See Hill*, 657 F.3d at 122 (citation omitted).   The plaintiff must allege that the defendant "knew of and disregarded the plaintiff's serious [dental] needs.'" *Harrison*, 219 F.3d at 137 (quoting *Chance*, 143 F.3d at 703). Mere negligent conduct, however, does not constitute deliberate indifference. *Hill*, 657 F.3d at 123

("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'") (quoting *Estelle*, 429 U.S. at 106).

The Second Circuit has defined the mental state of deliberate indifference as "[the] equivalent [of] subjective recklessness, as the term is used in criminal law;" and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious . . . harm [to the inmate's health] will result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37, 839-40 (1994)). As discussed *supra*, mere negligent or inadvertent conduct, however, does not constitute deliberate indifference. *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Salahuddin*, 467 F.3d at 280 ("recklessness entails more than mere negligence"). Also, "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703.

### 2. *Plaintiff's Section 1983 Claims*

Upon review of Dupas's factual allegations, it is apparent that his Eighth Amendment claim addresses three separate instances of alleged deliberate indifference by Dr. Cuevas and RCOO Shea. These defendants were allegedly deliberately indifferent to Dupas's need: (1) to have tooth no. 24 restored/capped instead of extracted at his April 3, 2018, appointment; (2) to have his cavities (especially in tooth nos. 3, 19, and 29) filled without novocaine,; and (3) for a prompt dental appointment to have an impression taken for a partial denture (to replace extracted tooth no. 24). The Court addresses each need in turn.

### a. Tooth Extraction -Tooth No. 24

With respect to the first prong of deliberate indifference, in order to comprise a "serious dental need," the condition must be "one that may produce death, degeneration, or extreme pain." *Leniart v. Borchet*, No. 3:20CV1098 (KAD), 2020 WL 5765607, at *5 (D. Conn. Sept. 28, 2020) (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). In the case at bar, the decay existing in tooth 24 was degenerative; the cap was broken and the previous root canal (by another dentist) was deemed substandard, leaving the tooth "unrestorable." Doc. 11-1, at 21 (Ex. 3). It is thus reasonable for this Court to conclude that, prior to extraction, tooth no. 24 comprised a serious dental need.

Moreover, Dr. Cuevas was subjectively aware of that dental need and suggested extracting the tooth. Dupas consented to the treatment, signing an "Oral Surgery Consent and Identification Form," Doc. 11-1, at 22 (Ex. 4); Cuevas then extracted the tooth. While, in retrospect, Dupas may be dissatisfied with the dental treatment he received, and may have preferred another option to extraction, there is no indication that Cuevas's extraction of tooth no. 24 constituted deliberate indifference to Plaintiff's serious dental needs. Extraction removed the problem, the infected tooth.

Reviewing Plaintiff's allegations in detail, in his Amended Complaint, Dupas alleges that on April 3, 2018, Dr. Cuevas saw him to address his problem of "a cap breaking off" on tooth no. 24. Doc. 11-1, at 3-4 (¶ 9). Cuevas recommended that the tooth be extracted because the root canal in that tooth had been performed prior to Dupas's confinement at MacDougall-Walker and had not been done at a level of quality acceptable within dental professional standards. *Id.* at 21 (Ex. 3).

Dupas, however, contends that Cuevas should have instead agreed to fill the tooth, and without anesthesia, or referred Dupas to a dentist at Garner, Cheshire, or UCONN, where Dupas believes such filling work would be performed without anesthesia. *Id.* at 4 (¶ 10).

There are no facts in the Amended Complaint or in the dental records submitted by Dupas to suggest that Dr. Cuevas refused to treat tooth no. 24 because it had a root canal. Rather, after reviewing the x-rays of tooth no. 24, Cuevas recommended that the tooth be extracted because the decay in that tooth was so severe that the tooth was not restorable. *Id.* at 21 (Ex. 3). At the time, Dupas immediately agreed to the extraction and signed a consent form permitting Dr. Cuevas to extract the tooth. *Id.* at 20 (Ex. 4). Dupas does not allege that he informed Dr. Cuevas that he was under the impression that tooth no. 24 only needed a new crown or that he otherwise protested the recommendation that tooth no. 24 be extracted.

Dupas provides no legal basis to argue that Cuevas improperly extracted his tooth. However, if he is attempting to assert that tooth no. 24 had "structural integrity," it is possible that he relies on the description of "Restorative Services" in State of Connecticut Department of Correction Administrative Directive 8.4. That directive provides at 8.4(5)(E): "Restorative services shall be limited to teeth with stable structural integrity as determined by appropriately trained and licensed health services staff." Dr. Cuevas did not find that the tooth was structurally stable. However, in any event, "[f]ailure to comply with an administrative directive . . . does not on its own give rise to a claim under 42 U.S.C. § 1983." *Schlosser v. Cook*, No. 3:19-CV-1971 (SRU), 2020 WL 3843699, at *2 (D. Conn. July 8, 2020) (citing *Harris v. Taylor*, 441 F. App'x 774, 775 (2d Cir. 2011)). *See also Osuch v. St. John*, No. 3:18-CV-846(JCH), 2018 WL 5778243, at *4 (D. Conn. Nov. 2, 2018) ("Because a failure to follow a Department of Correction directive does not give rise to a section

1983 claim, any claim based on St. John's alleged violation of Administrative Directives 8.1 and 8.5 is dismissed . . . .").

Furthermore, in assessing whether to pull tooth no. 24, Dr. Cuevas was exercising his medical judgment. Even if Dupas disagreed with respect to this treatment (*i.e.*, preferred a filling), "disagreements between a prisoner and prison officials over treatment decisions fall short of cruel and unusual punishment." *Estelle*, 429 U.S. at 107. Also, negligence in either diagnosing or treating a medical condition does not constitute deliberate indifference on the part of prison officials. *Harrison*, 219 F.3d at 139.

Given these circumstances, Dupas failed to adequately allege that Dr. Cuevas was deliberately indifferent to a serious dental need by extracting tooth no. 24. This Eighth Amendment claim against him will be dismissed for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b)(1).

RCOO Shea had no dealings with Plaintiff regarding the extraction of tooth no. 24. There is no proof that she either knew of or participated in any decisions regarding said extraction. Absent actual knowledge of that treatment, the Court will dismiss the Eight Amendment claim against her with respect to deliberate indifference regarding extraction of tooth no. 24.

#### b. Delay in Restoration of Teeth – Filling Cavities

Dupas has alleged that on April 3, 2018, and July 10, 2018, Dr. Cuevas identified three teeth that required fillings and informed him that he might lose all three teeth (nos. 3, 19, 29) if he did not receive the recommended restorative treatment. Doc. 11-1, at 3 (¶ 9), 5 (¶ 14), 21 (Ex. 3), and 30 (Ex. 8). A dental record documenting Dupas's appointment with Dr. Cuevas on July 10, 2018, includes a notation that Cuevas had identified Dupas's dental conditions as "Class 3 – Urgent dental

needs. Has conditions that require immediate treatment; or has conditions likely to become emergent under 12 months." Doc. 11-1, at 30 (Ex. 8). Moreover, "if fillings are not performed, then [these teeth] will need to be extracted at a later date." *Id.* Based on this evidence, the Court concludes that Dupas has plausibly alleged that he suffered from a serious dental condition during the thirteen-month period during which Dr. Cuevas refused to fill his teeth unless he consented to the injection of an anesthetic. *See Harrison*, 219 F.3d at 136–37 ("[A] tooth cavity is a degenerative condition, and if it is left untreated indefinitely, it is likely to produce agony and to require more invasive and painful treatments, such as root canal therapy or extraction. . . . Consequently, because a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law.") (citing *Chance*, 143 F.3d at 702–03) (untreated dental problems that resulted in chronic pain for a period of six months resulting in tooth degeneration and an inability to eat properly constituted serious dental need)). The Court must, therefore, address the subjective prong of the Eighth Amendment standard.

Dupas contends that Dr. Cuevas's refusal to perform the necessary fillings unless Dupas agreed to be injected with a local anesthetic constituted deliberate indifference to his serious dental needs. He concedes that Cuevas offered him treatment for his cavities (fillings *with* local anesthesia), but he refused said treatment unless Cuevas agreed to forgo the use of anesthesia. Dupas essentially disagreed with Dr. Cuevas's determination that it was not safe to fill these teeth without administering anesthesia.[6]

_____

[6] The Court takes judicial notice that use of local anesthesia is a recognized practice within the dental industry. The American Dental Association has publicly stated that "[t]he administration of local anesthesia, sedation and general anesthesia is an integral part to dental practice." American Dental Association, "Guidelines for the Use of Sedation and General Anesthesia by Dentists," October 2007, at 2. Additionally, local anesthesia is administered in various procedures to

Although Dupas alleges that he "does not take novocaine" for dental procedures, when Dr. Cuevas treated him on April 3, 2018, Dupas readily consented to a local anesthetic prior to having his tooth extracted during that appointment. *See* Doc. 11-1, at 3-4 (¶ 9), 21 (Ex. 3), and 22 (Ex. 4). In addition, Dupas provides no information as to why he generally refuses novocaine. This information suggests that  if, for example, he has a phobia of needles or experiences fear in connection with the administration of anesthetics, his phobia,  discomfort, or fear is not extreme, but rather perhaps an aversion to needles or the resulting sensation of numbness.

In light of Dr. Cuevas's knowledge that Dupas had recently consented to the administration of an anesthetic for a tooth extraction, Cuevas may have had little reason to believe that Dupas would not ultimately consent to anesthesia for these fillings.  Moreover, given the nature of the restorative work needed on urgently severe cavities, it falls well within a dentist's medical judgement to determine whether local anesthesia would be necessary  to perform such work.   The Court cannot thus conclude that Dr. Cuevas was deliberately indifferent to Dupas's serious dental needs.[7]  Doc. 11-1, at 111(Ex. 31) and 114 (Ex. 33).  Rather, Dr. Cuevas's decision was based on sound medical judgment.[8]   *See Hill*, 657 F.3d at 123 ("Issues of medical judgment cannot be the basis of a

---

implement the "elimination of sensation, especially pain" and is "the foundation of pain control in dentistry" with "a long record of safety." *Id*.

[7] It is also notable that according to RCOO Shea, Dental Director Katz fully agreed that the restoration work should not be done without the appropriate level of anesthesia.  Doc. 11-1, at 111 (Ex. 31).

[8] The Court does not seek to substitute its own judgment for that of a dental professional.  However, it is  reasonable to contemplate that local anesthesia has medical benefits during dental work. If the patient cannot experience pain, the dentist is reassured that the patient is comfortable and can then focus on the precision of the actual  procedure.  In other words, the dentist can perform the work accurately for the patient's benefit.  One can also envision potential injury to a patient if he reacts to pain and moves during treatment, causing a slip of the dentist's instruments.  For

deliberate indifference claim where evidence of deliberate indifference is lacking."); *Rush v. Canfield*, No. 13-CV-00191(S)(M), 2015 WL 12991158, at *6 (W.D.N.Y. Jan. 6, 2015) ("There is simply nothing in the record to suggest that [the] defendants' conduct in treating [the] plaintiff's back pain was based on anything other than medical judgment."), *aff'd*, 649 F. A'ppx 70 (2d Cir. 2016); *Lighthall v. Vadlamudi*, No. 9:04-CV-0721, 2006 WL 721568, at *10 (N.D.N.Y. Mar. 17, 2006) ("Because every doctor does not treat an illness in the same way, the mere difference in treatment by a defendant physician does not amount to culpability [under the Eighth Amendment].") (citations omitted).

Based on his medical judgment, Dr. Cuevas offered Plaintiff treatment for his cavities – fillings with local anesthesia. Plaintiff, however, refused. Cuevas did not ignore Plaintiff's cavities and instead warned him that they were likely to become "emergent" under 12 months, so unless he accepted treatment, the infected teeth would likely "have to be extracted. Doc. 11-1, at 30 (Ex. 8) and 33 (Ex. 10). Cuevas also informed Dupas that at any time he wanted to have his cavities filled with anesthesia, he could let him know and the work would be done. *See id.* at 35 (Ex. 11). "[T]o the extent that [a prisoner] alleges that he was not properly treated, or that he disagreed with the treatment given him ... that conduct does not rise to the level of a constitutional violation." *Sonds*, 151 F. Supp. 2d at 312. "Courts have repeatedly held that an omission of this nature does not amount to a constitutional violation." *Id.* (citation omitted). In offering to treat Plaintiff's cavities, Dr. Cuevas exhibited no "deliberate indifference" to the need for them to be filled.

---

example, filling a deep cavity may affect nerve endings within the tooth, causing intense pain during cleaning and grinding phases of the treatment. In any event, the determination of whether anesthesia may be required for a dental procedure should fall within a dentist's medical judgment. *See, e.g.,* https://www.mayoclinic. org/diseases-conditions/cavities/symptoms-causes/syc-20352892.

Furthermore, as to Dupas's requested treatment – a referral to another dentist at Garner, Cheshire, or UCONN – there is nothing in the record to suggest that Cuevas had the authority to make such a referral. As dentist at MacDougall-Walker, he was authorized to perform necessary dental procedures; but Plaintiff presented no evidence to demonstrate that Cuevas had the power to refer inmates to dentists at other prisons or locations for dental work assigned to him. Absent factual allegations that he had the power to require others to perform dental work on his prison patients, the Court finds no subjective reckless disregard for Plaintiff's serious dental needs. Dr. Cuevas stood ready to perform the work; Plaintiff just had to consent to accepting local anesthesia. The Eighth Amendment deliberate indifference claim against Dr. Cuevas is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

As to RCOO Shea, to recover money damages under section 1983, plaintiff must show that she was personally involved in a constitutional violation. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995). Defendant Shea is a supervisory official who cannot be held liable under section 1983 solely for the acts of her subordinates. *See Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir.1985). Moreover, to the extent that she became aware that Plaintiff sought dental fillings without local anesthesia but then deferred to Dr. Cuevas's medical judgment, she is not liable for deliberate indifference regarding supervision of Dr. Cuevas. As stated above, Dr. Cuevas's decision to require local anesthesia for filling these deep cavities was based on his sound medical judgment.

However, with respect to a delay of months in sending Plaintiff to another facility for treatment, the claim against Shea may proceed. Dupas has alleged, and the exhibits attached to his Amended Complaint demonstrate, that as of December 20, 2018, both RCOO Shea and Director Katz were aware of Dupas's need for restorative treatment of several teeth in the form of fillings and

that Dupas did not want to be anesthetized during this treatment. Doc. 11-1, at 12 (¶¶ 32-33),  110 (Ex. 30) and 111 (Ex. 31).   Dupas had filed inmate request forms and prison grievances, making Shea aware that he wanted a referral to a dentist at another facility who would perform the same type of dental work on him without anesthesia. *Id.* at 32 (Ex. 9), 45 (Ex. 16),  108-09 (Ex. 29), and  112-14 (Ex. 32).  Shea did not, however, send  Dupas to Cheshire to have the dental treatment performed by Dr. Lichtenstein until May 16, 2019, possibly in response to a call from Dupas's mother in April of 2019 about taking legal action to ensure that her son would receive dental treatment.  *Id.* at 14 (¶ 36)   and 115-21 (Ex. 33).

On the dental records for the May 16, 2019, visit to Cheshire, Lichtenstein indicated that Dupas had stated, "I need to get my dental work done. . . no one else will do it." *Id.* at 115 ("History of Present Illness: with details regarding duration, frequency, relieving and worsening factors, etc.").  Also, noting that the dental work was "accomplished successfully . . . [with] [n]o anesthesia at patient['s] request," Lichtenstein further confirmed that these cavities were "Class 3 -Urgent" dental needs and documented that certain ones were "very deep." *Id.* at 121 (Ex. 33).   In addition, Lichtenstein reported that the referral had been made by an RCOO, stating that "Patient . . . transferred from MacDougall CI at request of RCOO to complete patient's dental work." *Id.* at 120 ("Note").  Because RCOO Shea had been the "RCOO" who communicated with Dupas regarding his problem, and had "talked to the dentist at Cheshire" to arrange Dupas's visit, it appears that Shea made the transfer. *Id.* at 14  (¶ 36).  As  an  RCOO, Shea was in the position to make this transfer, was aware of the months during which the urgent cavities remained unfilled,  and only effected the transfer in April or May 2019.

Given the allegations suggesting that RCOO Shea was aware of the seriousness of Dupas's dental needs and that referral to a dentist in another facility for the necessary treatment without anesthesia was a viable option (*i.e.*, had been done before), it could be inferred that RCOO Shea was deliberately indifferent to the serious risk of harm presented by deep cavities in at least three of Plaintiff's teeth. She realized that Dupas was averse to anesthesia, but there is no indication that she investigated the underlying cause for that aversion.[9] Moreover, she knew that other facilities' dentists exercised their own medical judgment to consider it viable to fill Plaintiff's teeth without injecting local anesthesia. Furthermore, it was clear to Shea that absent transfer to another prison facility's dentist, Dupas's "urgent" condition would continue to degenerate. Despite the passage of months, Shea did not refer or transfer Dupas to Cheshire to have his cavities filled by Dr. Lichtenstein until May 16, 2019, possibly after being prompted by his mother's phone call in April 2019.

At the initial pleading stage, the Court finds a plausible "deliberate indifference" claim for Shea's delay in transferring Dupas to another prison facility to fill these cavities.[10] The Court will

---

[9] Although disagreement over method of treatment does not create a constitutional claim, it may also be that, in addition to preference, Dupas had complications or other reasons to avoid local anesthesia (*e.g.*, a problematic physical or mental condition). For example, his prison medical records reflect that he takes a number of medications and suffers from "sleep apnea," "Diabetes mellitus, type 2," "Impulse control disorder," "mental retardation mild," and "mood disorders." Doc. 11-1, at 115 (Ex. 33). As the prison's own "Oral Surgery Consent and Identification Form" indicates, "Anesthesia" has risks that can include such problems as "pain, swelling, bruising, infection, nerve damage, allergic reactions, . . . heart attack, stroke, brain damage, or death." *Id.* at 22 (Ex. 4). At the early stage of this litigation, Plaintiff is left to his proof regarding this claim.

[10] The Court notes that Dr. Lichtenstein actually performed restoration on seven teeth, performing "amalgams" on tooth nos. 3, 4, 19, 29, and 30 and "resin composites" on tooth nos. 27 and 28. Doc. 11-1, at 120 ("Cumulative Completed").

permit his Eighth Amendment claim to proceed against RCOO Shea, in her individual capacity for damages, pending further development of the record.

### c. Delay in Making Impression for Dentures/Flipper

To examine the first prong of Plaintiff's claim regarding failure to make an impression for dentures or a flipper, the Court reviews his allegations. Dupas alleges that on May 16, 2019, the date that a dentist at Cheshire performed restorative treatment for many teeth that needed fillings, he filed an inmate request with the Dental Department at MacDougall-Walker seeking a prosthetic to replace tooth no. 24 that had been extracted by Dr. Cuevas on April 3, 2018. Doc. 11-1, at 9 (¶ 24) and 48 (Ex. 18). In response to this request, a dental staff member indicated that Dupas would be placed on the list to be evaluated for a prosthetic tooth. *Id.* at 48 (Ex. 18).

Thereafter, on December 16, 2019, Plaintiff sent a written "Inmate Request Form" to be "called down" to dental to have "an impression done to replace the tooth that was removed by [Dr. Cuevas] on April 3, 2018." *Id.* at 49 (Ex. 19). Plaintiff requested to have such an appointment scheduled in the "next fifteen business days." *Id.* However, on January 3, 2020, Dr. Cuevas responded that Plaintiff was "on the list for treatment;" and "[o]nce all other treatment is completed we may ask permission to start dentures." *Id.*

Because he was not scheduled for an impression as of January 9, 2020, Dupas filed a grievance to request a dental appointment for that purpose in the next 15 days. *Id.* at 10 (¶ 26) and 51-52 (Ex. 20). Dupas stated that it had been "over a year since Cuevas extracted the tooth" he wanted replaced and, due to its location, it was "hard for [him] to eat certain fruit," like "apples." *Id.* at 10 (¶ 26) and 52 (Ex. 20). To resolve the issue, he requested "an impression to be taken in the next 30 business days, other treatment to be done, [an order] for dentures be submitted," and

"$5.00 per day from April 4, 2018, [the date after extraction, till the] date dentures are given to [him]" in light of the pain Cuevas caused him to suffer while waiting for an impression and dentures. *Id.* at 52 (Ex. 20).

Although Dupas alleged difficulty eating some fruits, he did not assert that the missing tooth caused extreme pain or interfered with his daily activities, such as his ability to chew or eat food in general.  Doc. 11-1, at 52 (Ex. 20).  In fact, the Court notes that his medical records reflect that Dupas gained weight between the time of the extraction ( April 2018) and when he filed his request for the impression (December 2019).  For example, his prison medical records reflect that on July 5, 2018, he weighed 283 pounds, but as of December 27, 2019, his weight had increased to 296 pounds (with a Body-Mass Index of 40.29).  Doc. 11-1, at  33 (Ex. 10) and 53 (Ex. 21) ("Current Vital Signs").  Moreover, Dupas did not allege extreme or debilitating pain or request any pain medication.  Instead, he simply requested $5 per day due to "pain" Cuevas allegedly inflicted by not taking the requested impression. *Id.* at 52 (Ex. 20).  Given such facts, on Dupas's dental records, Dr. Cuevas  gave the need for this dental impression a "Dental Classification" of "Class 2- Routine" with "Conditions unlikely to become emergent within 12 months."[11]  *Id.* at 58 (Ex. 21).

With respect to the first prong of deliberate indifference, in order to comprise a "serious dental need," the condition must be "one that may produce death, degeneration, or extreme pain." *Leniart v. Borchet*, No. 3:20CV1098 (KAD), 2020 WL 5765607, at *5 (D. Conn. Sept. 28, 2020) (citing  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).  In the case at bar, Plaintiff has failed to allege sufficient facts to establish that missing tooth no. 24 created a serious dental need.

---

[11]  Dr. Lichtenstein at Cheshire also characterized the request for dentures as "Class 2- Routine dental needs." Doc. 11-1, at 121 (Ex. 33).  He indicated no urgency when he  wrote: "told patient to inquire with staff dentist at facility about fabricating flipper to replace tooth [no. 24]." *Id.*

He continued eating and participating in his daily activities while waiting for the dental impression. Also, a dental examination regarding "any mobility on anterior teeth near [the] extraction site" of tooth no. 24 showed that these teeth were "within normal limits." Doc. 11-1, at 33 (Ex. 10). There was thus no risk that Dupas would die or suffer a degenerative condition or extreme pain while waiting for his dentures. Accordingly, he has failed to meet the objective component of the Eighth Amendment standard.

Furthermore, as to the second prong, the prisoner must prove that the official "knew of and disregarded the prisoner's serious medical needs." *Chance*, 143 F.3d at 702; *Harrison*, 219 F.3d at 137–38. Here, even if Dupas's requested dental impression had created a serious dental need, there is no indication that Cuevas subjectively disregarded Dupas's request for such an impression.[12] Upon learning of Dupas's request on December 16, 2019, Cuevas placed him on the list for this treatment. Then, on February 10, 2020, the requested dental impression was made. Doc. 11-1, at 10-11 (¶ 27). The medical records (Ex. 21) indicate that on that date, Dupas had an "oral evaluation" and the "problem focused [was] completed." *Id.* at 58 (Ex. 21) (stating "Pt [patient] seen in reference to grievance for anterior mandibular tooth, 1 PA take[n]. . . Grievance completed."). Dupas has not alleged that Dr. Cuevas was aware of any request for an impression prior to December 2019; and Cuevas appears to have completed that request in February 2020. Granted, there was a delay of weeks. However, where Plaintiff was not enduring a risk of death, a

---

[12] Dupas has produced a note written on May 16, 2019, in which he requested Dr. Cuevas to "call [him] down" to "have an impression" made to "replace the tooth that was removed by [Cuevas] last year." Doc. 11-1, at 48 (Ex. 18). However, there is no proof that Cuevas actually read the note. The response to the note was written by a dental assistant who told Dupas that he was "added to the list for prosthetics" and will be called when his "turn comes." *Id.*

degenerative condition, or  extreme pain, there is no indication that a delay of eight weeks constituted cruel and unusual punishment in violation of the Eighth Amendment.

 Furthermore,  Dupas has pled no facts to show that  RCOO Kirsten Shea was personally aware that he submitted requests to the dental department for a prosthetic tooth.  Therefore, even if this routine dental need had actually been sufficiently "serious,"  the  allegations that she failed to "take disciplinary action" to prevent  "denial and/or delay of adequate dental care . . . by defendant Cuevas," with respect to scheduling  an appointment to fit a prosthetic tooth,  fail to state a plausible claim of deliberate indifference to a serious dental need.  Doc. 11-1, at 16 (¶ 40).  This Eighth Amendment claim, regarding impressions for a flipper,  is dismissed against both defendants. *See* 28 U.S.C. § 1915A(b)(1).

### 3. *Malpractice*

#### a.  Dr. Cuevas

Plaintiff brings medical  malpractice claims against Dr. Cuevas and RCOO Shea that he describes as a "tort."  Doc. 11-1, at 15 (¶ 41).  Connecticut General Statutes § 4-165 bars tort claims against state employees acting within the scope of their employment, stating:   "(a) No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment."

Plaintiff has sued Dr. Cuevas regarding duties within his employment as a dentist at a state prison, MacDougall-Walker.  The malpractice claim against him in his individual capacity is thus barred. *See, e.g.,  Acevedo v. Ruiz*, No. 3:18-CV-1583 (VLB), 2018 WL 6181350, at *2 (D. Conn. Nov. 27, 2018) (dismissing prisoner's Connecticut state law malpractice claims against doctor and nurse at Cheshire Correctional Institution pursuant to Conn. Gen. Stat. § 4-165).

Furthermore, even if the malpractice action against Cuevas were cognizable, Connecticut's malpractice statute, Connecticut General Statute § 52-190a, requires that a plaintiff submit a good faith certificate and a health care provider's detailed opinion that the actions of the defendant constitute medical malpractice. The absence of such a letter requires dismissal of the claim without prejudice.

Specifically, Connecticut General Statute § 52–190a, provides in relevant part: "(a) No civil action . . . shall be filed to recover damages resulting from personal injury . . . occurring on or after October 1, 1987, whether in tort or in contract, in which it is alleged that such injury . . . resulted from the negligence of a health care provider, unless the attorney or party filing the action . . . has made a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant." Conn. Gen. Stat. § 52-190a. Furthermore, "[t]he complaint . . . shall contain *a certificate* of the attorney or party filing the action . . . that such reasonable inquiry gave rise to a good faith belief that grounds exist for an action against each named defendant . . . . ." *Id.* (emphasis added). "To show the existence of such good faith, the claimant shall obtain *a written and signed opinion of a similar health care provider*, as defined in section 52-184c, . . . that there appears to be evidence of medical negligence and includes a detailed basis for the formation of such opinion." *Id.* (emphasis added).[13]

---

[13]   As the Connecticut Supreme Court explained in *Gold v. Greenwich Hospital Assn.*, 262 Conn. 248, 254-55 (2002), "professional negligence or malpractice ... [is] defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services...." Additionally, "malpractice presupposes some improper conduct in the treatment or operative skill [or] ... the failure to exercise requisite medical skill." *Gold,* 262 Conn. at 254 (citation omitted and emphasis in original). *See also Jarmie v. Troncale*, 306 Conn. 578, 587–88 (2012).

Moreover, "[t]he failure to obtain and file the written opinion required by subsection (a) of this section shall be grounds for the dismissal of the action."  Conn. Gen. Stat. § 52-190a(c).

In the case at bar, even if this action against Cuevas were not barred under Connecticut General Statutes § 4-165, Plaintiff failed to comply with the requirements regarding malpractice actions under Conn. Gen. Stat. § 52-190a.  He provided no certificate indicating that he made a reasonable inquiry that gave him a "good faith" belief that Cuevas committed negligence in his care or treatment.  He also failed to provide a written opinion from a "similar health care provider" that there appears to be evidence of medical malpractice.  Accordingly, his claim would still be dismissed pursuant to Conn. Gen. Stat. § 52-190a even if Dr. Cuevas were not a state employee discharging his duties within the scope of his employment, Conn. Gen. Stat. § 4-165.[14]

### b.  RCOO Shea

Plaintiff's malpractice claim against RCOO Shea is also dismissed.  That state malpractice claim is barred by Connecticut General Statute § 4-165 as a tort claim against a state employee acting "within the scope of . . . her employment."

Furthermore, even if the action were cognizable, the Court questions whether RCOO, as a prison administrator, is even a "health care provider" under the language of Connecticut's

---

[14] Per the actual language of the Connecticut statute, said "failure to obtain and file the written opinion . .. shall be grounds for dismissal of the action." Conn. Gen. Stat. § 52-190(c).  *See also Bennett v. New Milford Hosp., Inc.*, 300 Conn. 1, 28 (2011)  ("[D]ismissal is the mandatory remedy when a plaintiff fails to file an opinion letter that complies with § 52–190a (a).").  *See also Boykin v. Rutherford*, No. CV075009783S, 2007 WL 4636530, at *3 (Conn. Super. Ct. Dec. 6, 2007)  ("[A] failure to comply with the requirements of § 52-190a deprives the court of subject matter jurisdiction . . . .  The statutory language and the legislative intent indicate that the requirement of obtaining and filing an opinion was intended as a jurisdictional hurdle for medical malpractice actions.") (quoting *Votre v. County Obstetrics & Gynecology Group,* Superior Court, Judicial District of New Haven, Docket No. CV 06 5005430 (May 24, 2007, Holden, J.)).

malpractice statute.  Under Connecticut General Statutes § 52–190a, a cause of action alleging medical malpractice must be brought by a patient *against a health care provider.*  The language of the statute specifies that "such injury or death resulted from the negligence of a health care provider" such that there was "negligence  in the care or treatment of the claimant...." *See, e.g.,  Jarmie v. Troncale*, 306 Conn. 578, 587 (2012) (quoting Conn.  Gen. Stat. § 52–190a (a)) (emphasis added). For purposes of the statute, a "health care provider" is defined as "any person, corporation, facility or institution licensed by this state to provide health care or professional services, or an officer, employee or agent thereof acting in the course and scope of his employment." Conn. Gen. Stat. § 52-184b.

Here, there is no indication that Shea is licensed to provide medical care in Connecticut.  Nor does she act as a medical professional in her administrative role as an RCOO  at a state prison.[15] There  is also no evidence to suggest that MacDougall-Walker is a licensed "health care" institution.

In any event, even if Shea were considered a "health care provider," as set forth *supra*, the present malpractice claim against her must be dismissed due to her role as a state employee, Conn. Gen.Stat. § 4-165, as well as Plaintiff's failure to attach to his Amended Complaint a certificate of good faith and to obtain a written report of a similar health care provider, Conn. Gen. Stat. § 52-190a(c).

---

[15]  According to a recent job posting for an RCOO in  the State of Connecticut's DOC, the position of RCOO involves  "directing the planning, implementation, management and evaluation of the overall health services for assigned correctional facilities."  *See* Connecticut DOC Job Listing for  "Regional  Chief  Operating  Officer"  (posted  at  https://www.jobapscloud.com/CT/sup/ bulpreview.asp? R1=210624&R2=2520MP&R3=001).

### E.  Jurisdiction and Exhaustion of Remedies

Because the remaining claim in the action arises under 42 U.S.C. § 1983, a federal statute, this Court has "federal question" subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which grants district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

With respect to exhaustion of administrative remedies, pursuant to 42 U.S.C. § 1997e, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  In his Amended Complaint, Plaintiff has alleged that he has "exhausted  [his] administrative remedies with respect to the claim and all defendants," citing a series of Exhibits,  each of which is an "Inmate Administrative Remedy Form" Dupas filed with the Connecticut Department of Correction. *See*, *e.g.,*  Doc. 11-1, at 31 (Ex. 9), 37-47 (Ex. 12-17), and 51-52 (Ex. 20).  From the cited exhibits, it appears that Dupas has plausibly exhausted his inmate administrative remedies through the prison grievance process.  If, however, upon entering the case, defendant RCOO Shea wishes to challenge Plaintiff's attempted exhaustion as insufficient, she must demonstrate that additional administrative remedies remained available and unexhausted.[16]  In that event, Plaintiff may come forward to counter such an assertion.  *See, e.g.,*

---

[16] As the Second Circuit has stated, "failure to exhaust is an affirmative defense." *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), *abrogated on other grounds by  Ross v. Blake,* 578 U.S. 632 (2016).  Because administrative exhaustion is not a jurisdictional predicate, *Richardson v. Goord*, 347 F.3d 431 (2d Cir.2003), a plaintiff is entitled to notice and an opportunity to be heard before a court can dismiss his complaint for failure to exhaust administrative remedies, *Snider v. Melindez*, 199 F.3d 108 (2d Cir.1999). *See also Rucker v. Giffen*, No. 20-1318, 2021 WL 1803655 (2d Cir. May 6, 2021) ("[A] prisoner need not specifically plead or demonstrate exhaustion in the complaint because 'failure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement.'") (quoting *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir.

*Ross v. Blake*, 578 U.S. 632, 636 (2016).[17]

### III.  INITIAL REVIEW ORDER

In accordance with the foregoing analysis, the Court GRANTS in part and DENIES in part Plaintiff's Motion to Amend [Doc. 11], as set forth in the terms of this Order.  Having screened Plaintiff's "Amended Complaint" [Doc. 11-1] pursuant to 28 U.S.C. § 1915A, the Court hereby enters the following "Initial Review Order":

(1)  All Eighth Amendment claims for deliberate indifference to serious dental needs against Dr. Cuevas are DISMISSED pursuant to 28 U.S.C. § 1915A(b)(1) because they "fail[ ] to state a claim upon which relief may be granted."

(2)  All Eighth Amendment claims for deliberate indifference to serious dental needs against RCOO Shea are DISMISSED as failing to state a claim under 28 U.S.C. § 1915A(b)(1) *except* the claim relating to delay in referring or transferring Dupas to another facility for treatment (*i.e.*, to fill his cavities).  That claim will **PROCEED** against RCOO Shea in her individual capacity for money damages.

(3)  The Connecticut malpractice claims against Dr. Cuevas and RCOO Shea are both DISMISSED pursuant to Connecticut General Statutes § 4-165, which bars tort claims against state employees acting within the scope of their employment.  Moreover, even if these state tort claims

---

2016)).

[17]  *See also, e.g., Rucker v. Giffen*, No. 20-1318, 2021 WL 1803655 (2d Cir. May 6, 2021) (holding  administrative remedies are "unavailable" when (1) an inmate's failure to file for the administrative remedy within the time allowed results from a medical condition, and (2) the administrative system does not accommodate the condition by allowing a reasonable opportunity to file for administrative relief").

had not been barred, they are defective, subject to dismissal under Connecticut's malpractice statute, Conn. Gen. Stat. § 52-190a. RCOO Shea is not a licensed "health care provider," Conn. Gen. Stat. § 52-184b; and Plaintiff has failed to attach any certificate of good faith and to obtain a written report of a similar health care provider, Conn. Gen. Stat. § 52-190a(c), with respect to either Cuevas or Shea.

(4)   Within twenty-one (21) days of this Order, the Clerk shall verify the current work address of Regional Chief Operating Officer Kirsten Shea and mail a copy of the Amended Complaint, this Order and a waiver of service of process request packet to her in her individual capacity at the confirmed address. On the thirty-fifth (35th) day after mailing, the Clerk shall report to the Court on the status of the request. If defendant Shea fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshal Service and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(5)   Defendant Shea shall file a response to the Amended Complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to her. If she chooses to file an answer, she shall admit or deny the allegations and respond to the cognizable claim recited above. She may also include all additional defenses permitted by the Federal Rules.

(6)   Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within six months (180 days) from the date of this order. Discovery requests need not be filed with the Court.

(7)   All motions for summary judgment shall be filed within seven months (210 days) from the date of this order.

(8)   The Clerk shall send a courtesy copy of the Amended Complaint and this Order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit.

(9)   The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which will be sent to the parties by the Clerk. The Standing Order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders.

It is SO ORDERED.

Dated: New Haven, Connecticut
          March 30, 2022

/s/Charles S. Haight, Jr.
CHARLES S. HAIGHT, JR.
Senior United States District Judge